372 A.2d 510.

RAYMOND E. KENNEY *et ux. vs.*
PROVIDENCE GAS COMPANY.

APRIL 22, 1977.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

136

KELLEHER, J. The plaintiffs are husband and wife. On November 29, 1970, a gas-fed explosion completely demolished their Warwick home. Thereafter, they instituted this action and in their complaint alleged that the defendant was negligent by its failure, after having been asked to do so, to remove a "high-pressure gas service" that was located in their cellar and by its assurance that the high-pressure gas service had been "disconnected, shut off, or otherwise rendered inoperative." A Superior Court jury returned a verdict for the defendant, and the plaintiffs are before us on a single-issue appeal.

The plaintiffs claim that the trial justice committed prejudicial error when, during defendant's presentation of its evidence, he barred them from pursuing a line of cross-examination which was premised on a "failure-to-warn" theory of negligence. Hereinafter, when referring to plaintiffs, we shall refer only to the husband and then by his last name. The defendant shall be referred to as "Providence Gas" or "the utility."

Kenney testified that he and his wife had purchased their four-room home in November of 1969. The home was part of a plat that had been developed in 1949 by a contractor named Pearson. During the development of the Pearson plat, Providence Gas had made the necessary excavations and established a series of mains and pipes so that each house in the plat was piped for gas. The gas pipes ran from a main buried in the street, underground through the foundation, and protruded into the cellar about a foot. The protrusion consisted of a length of pipe and a valve. Those homeowners who were desirous of using the utility's product would contact Providence Gas. Thereafter, a meter would be attached to the valve, and the homeowner would soon be "cooking with gas." The Kenneys did not cook with gas, and neither did their

predecessors in title. The valve in the Kenney cellar had been in a closed position for over 20 years.

Kenney told the jury that in early November 1970 he decided to embark on a do-it-yourself project and add two additional rooms to his four-room home by remodeling the cellar. Part of his home renovation plan included the installation of wood paneling along the foundation walls, but before Kenney could proceed, something had to be done about the protruding gas pipe. According to Kenney, he telephoned Providence Gas and asked it to remove the protruding pipe. After the call had been referred to a number of departments, Kenney was told that the line going into his home was "dry" because it had been shut off at the street, and since he was not a customer, it was up to him to remove the pipe and do with it what he wished.

Thus it was that at approximately 6 p.m. on November 29, 1970, Kenney, with a stillson wrench in hand, went into the cellar and began to remove the valve. His goal was to remove the valve and replace it with a galvanized cap. As the valve turned, Kenney heard a hiss and smelled gas. He thought that the hiss emanated from some residual gas that remained in the pipe. As the valve fell to the floor, a steady stream of "grayish dirty" vapors poured out of the pipe. Kenney then attempted to return the valve to its original position. When these efforts proved fruitless, his wife told him to "get out of there"; then she ran upstairs and took their sleeping infant to a place of comparative safety. After calling the fire department about the gas leak, Kenney left the house and joined his family on the front lawn.

Two fire chiefs responded to Kenney's call. They ran up the driveway and then beat a hasty retreat. Kenney said that seconds later "I saw the entire structure like light up, and then [a] tremendous explosion followed

that lighting. And then the entire walls of the house blew out." The explosion was followed by the arrival of firefighters, a gas company crew, and representatives from the State Division of Public Utilities.

It is conceded that the pipes running into each house in the Pearson plat were carrying a "high-pressure service" and the gas at the valve was under a pressure measured a constant 35 pounds per square inch. A representative of Providence Gas described the removal and attempted replacement by an inexperienced person of a valve on a high-pressure line as having the potential for a "very dangerous situation." The line running into Kenney's house was not "dry." In fact, there was no shutoff in the street, and the fire that followed the explosion could not be extinguished until the utility's crew had dug up the street and used a "hydraulic pipe squeezer" to clamp off the line.

The utility's defense was premised on its contention that Kenney had never called Providence Gas. It presented testimony which indicated that on the night of the explosion Kenney told the firefighters that he had never touched the pipe and was upstairs when he heard the hiss and smelled the gas. A representative of the Public Utilities Division testified that on the night of the explosion he asked Kenney about the stillson wrench that was found in the rubble near the protruding pipe. Kenney did not tell the police of his telephone conversation until the day following the explosion.

As part of its "no call" defense Providence Gas presented as witnesses several of its supervisory personnel, who discussed the utility's standard operating procedure for dealing with telephone inquiries concerning protruding, unused gas lines. All such calls were handled by a staff of trained personnel who were required to prepare a work order which was based upon the information given

by the caller. The work order was then processed through the various company channels and eventually a serviceman or repair clerk would appear at the caller's home and remove the protrusion. The company searched its records but could find no evidence of any work order relating to the Kenney home.

These witnesses emphasized that the staff treated each caller as a customer even though the call related to an inoperative service because the utility did not want "the customer touching the pipe." Providence Gas had another, less altruistic, purpose in its response-to-all-calls policy. The valve portion of the protrusion is an expensive product, and the utility was delighted to remove the valve because it would then be retained, refurbished, and reused in some other location.

During his cross-examination the utility's Superintendent of Construction and Maintenance described the dangers and difficulties faced by the inexperienced individual who would attempt to replace the valve on a high-pressure line. The superintendent conceded that there were localities within Providence Gas's distribution area that were served with no-risk low-pressure lines.

It was at this point that Kenney's counsel attempted to ask the Superintendent of Construction and Maintenance if his employer made it a practice to warn the homeowner of the dangers he would face once he removed the valve from a high-pressure line. The utility's objections to this question and two of the same vein which followed were sustained. In the colloquy that followed, Kenney's counsel argued that the failure to warn was an issue in the case because Kenney, when asked by Providence Gas in its interrogatories to specify the utility's negligence, had first referred to the telephone misinformation and then replied that "the pipe was not marked as a high pressure pipe to prevent accidental opening." Ken-

ney also claimed that the failure to warn was in issue because earlier in the trial he had testified that he had noticed no tags or warnings present on the pipe as he began his removal operation. The trial justice remarked that he had the discretion to grant a motion to amend so that the pleading and proof would conform, but the evidence which Kenney now sought to adduce from this witness was completely at odds with the theory that had been advanced by Kenney when he presented his evidence. The objections having been sustained, the examination of the superintendent was concluded, and he left the witness stand.

In pressing this appeal, Kenney argues at great length and with much vigor that in the jurisprudence of today a variance between the pleadings and the proof is no longer as fatal as it was in the day when common law pleading held full sway in the courts of this jurisdiction. He directs our attention to the pertinent parts of Super. R. Civ. P. 15, whose unquestionable purpose is to afford a litigant a reasonable opportunity to have his claim tried on the merits rather than a procedural technicality. We have recognized the spirit of this rule and have observed that this court had taken a liberal attitude toward amendment of pleadings long before the Superior Court adopted its Rules of Civil Procedure. *Ricard* v. *John Hancock Mut. Life Ins. Co.*, 113 R.I. 528, 540, 324 A.2d 671, 677 (1974).

Notwithstanding this liberal attitude, it is well-settled that a motion to amend the pleadings so that they conform to the proof under Rule 15(b) rests in the sound discretion of the trial court. This proviso stipulates that issues not framed by the pleadings, but which are tried by either the express or implied consent of the parties, shall be treated as if they had been raised by the parties, and the pleadings shall be amended to conform upon the motion of any party at any time, even after judgment.

We ourselves have observed that issues tried by express or implied consent, even though they are not embraced by the pleadings, will be treated as if they have been pleaded even in the absence of an amendment. *Cofone v. Narragansett Racing Ass'n,* 103 R.I. 345, 237 A.2d 717 (1968). However, at this point we should point out that amendments to interrogatories are not part of the pleadings. 4A Moore, *Federal Practice* ¶33.29[2] at 33-167 (1975 ed.); 8 Wright & Miller, *Federal Practice and Procedure: Civil* §2180 at 572 (1970 ed.).

It is clear from the record that Providence Gas did not give its express consent when Kenney attempted to expand his claim to bring in the utility's failure to warn him about the risk of having a high-pressure line in the cellar. If consent is present in this record, it must be of the implied species. Despite the broad remedial purpose of Rule 15(b), implied consent to the trial of an unpleaded issue is not established merely because evidence which is relevant to an issue expressly embraced by the pleading will also inferentially suggest the unpleaded issue. There can be no implied consent under Rule 15(b) unless the parties clearly understand that the evidence in question is aimed at the unpleaded issue. *MBI Motor Co.* v. *Lotus/East, Inc.,* 506 F.2d 709, 711 (6th Cir. 1974); 3 Moore, *Federal Practice* ¶15.13[2] at 991-92 (1974 ed.); 6 Wright & Miller, *Federal Practice and Procedure: Civil* §1493 at 466-67 (1971 ed.).

In applying the principle of implied consent to the case under review, we find that throughout his presentation of evidence Kenney was proceeding on the theory that the telephonic misinformation given him constituted negligence. In order to obtain a favorable verdict, he not only had to convince the jury of the utility's negligence, but he also had to prove his freedom from negligence. Kenney conceded that he was aware that the protruding

pipe in his cellar was a gas pipe and that he continued to turn the valve after he had first smelled the gas. His reference to the absence of tags, in our opinion, was pertinent to the contributory negligence issue. Consequently, we believe that the tagging portion of the testimony presented by Kenney affords no basis for finding an implied consent by Providence Gas to the expansion of Kenney's claim into one involving a failure to warn.

Having found no express or implied consent to the trial on the failure-to-warn theory, we are still confronted with the last portion of Rule 15(b) which provides that when an objection is made to the introduction of evidence on the ground that it is outside the pleadings,[1] "* * * the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits." In the event the objecting party needs time to meet such new evidence, the trial justice may grant a continuance. In discussing the federal counterpart to our rule, Wright and Miller have observed that to justify the exclusion of the evidence, the objecting party must be seriously disadvantaged. Mere allegations of surprise, not substantiated by the facts, will not suffice. Absent a showing of extreme prejudice, a trial justice should permit the proposed amendment and allow the evidence. To do otherwise may constitute an abuse of discretion warranting reversal. 6 Wright & Miller, *Federal Practice and Procedure*: *Civil* §1495 at 478-80 .(1971 ed.).

---

[1]While Kenney made no request to amend his pleadings, the trial justice's comments made it clear that any motion to amend would have amounted to an exercise in futility. Consequently, we are viewing the record as if the motion to amend had been made and denied.

■ It is well-established that proposed amendments under Rule 15(b) are allowed with the greatest liberality. In *Robbins* v. *Jordan*, 181 F.2d 793 (D.C. Cir. 1950), the plaintiffs sought to amend in order to argue a second theory of the case. The appellate court observed that "a defendant should be protected from surprise resulting from a change of theory; but * * * [t]he proper procedure would have been to grant the defendant a continuance in order to meet the new evidence." *Id.* at 795. *Accord, Billups* v. *Chauvin*, 262 So.2d 89 (La. App. 1972).

The case before us is in a similar posture. It is evident that Providence Gas had some indication of a failure-to-warn theory even though it was not advanced in the formal pleadings. Even assuming the utility would be taken somewhat off its guard by this new evidence, we fail to see that this could not be remedied by a brief continuance. *Robbins* v. *Jordan*, *supra*; *Billups* v. *Chauvin*, *supra*.

■ Under Super. R. Civ. P. 8(e)(2) a plaintiff may plead as many theories of relief as he may have regardless of their consistency. It appears to us that had Kenney been allowed to amend the complaint and argue on this theory, the jury could well have returned a verdict in his favor. This was a high-pressure line which the company knew to be active and dangerous in the hands of laymen. Kenney might well show that had the line been tagged, he wouldn't have touched it with a 10-foot pole — never mind a stillson wrench.

We find, therefore, that the trial justice abused his discretion by failing to consider this aspect of Rule 15(b) and denying Kenney's request to amend.

The plaintiffs' appeal is granted, and the case is remanded to Superior Court for a new trial on the failure-to-warn issue.

Petition for reargument denied.

*Roberts & Willey, Inc., Bruce G. Tucker,* for plaintiffs.

*Hinckley, Allen, Salisbury & Parsons, Michael DeFanti,* for defendant.